IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DAVID CARDON,<br><br>Plaintiff,<br><br><br><br>vs.<br><br><br>TESTOUT CORPORATION, a Utah Corporation; DIRECT LIST SERVICES, a Utah Corporation; MOUNT FRANKLIN HOLDING COMPANY, L.L.C., a Utah limited liability company; NOEL VALLEJO; DOUGLAS EDWARDS; and SQUIRE & COMPANY, P.C., a Utah corporation,<br><br>Defendants. | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION FOR ATTORNEY'S FEES<br><br><br><br><br><br>Case No. 2:04-CV-00873 PGC |

This is a securities action in which the plaintiff, David Cardon, claims that he was not paid fair market value for his share of three companies in 2001. He alleges defendants made fraudulent misrepresentations and omissions during 2001 about the true profitability of the companies that lead him to receive less than he should have for his shares. Yet a year earlier — on June 14, 2000 — Cardon voluntarily resigned as a director and officer of the companies, thereby terminating his employment. It is undisputed that his employment agreement required him to sell his shares when he resigned. It is also undisputed that, in accordance with that

requirement, his resignation letter stated: "With my resignation, I give you my voting shares in these companies and sell all of my stock in these companies to you pursuant to the terms of our buy-sell agreement."

Because Cardon had clearly determined to sell the shares in June 2000, any subsequent misrepresentations were not a causal factor in his decision to sell. Cardon has not established any grounds for believing that federal or state securities laws have been violated, so the court grants summary judgment for the defendants on those claims. The court also grants summary judgment on Cardon's fraud, negligent misrepresentation, and quantum meruit claims. Based on the written contract between Cardon and the defendants, the court also awards reasonable attorney's fees. The court declines to exercise pendent jurisdiction over the remaining state law claims.

## I.      Summary Judgment Standard and Facts

Summary judgment is appropriate only "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"[1]  The court must "view the evidence, and draw reasonable inferences therefrom, in the light most favorable to the nonmoving party."[2]  But "the 'mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient' to create a genuine issue of

---

[1]*Green v. New Mexico*, 420 F.3d 1189, 1192 (10th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

[2]*Id.* (citing *Plotke v. White*, 405 F.3d 1092, 1094 (10th Cir. 2005)).

material fact."[3]  Thus, to preclude summary judgment, "the nonmovant must present facts upon

which a reasonable jury could find in favor of the nonmovant."[4]  With these standards in mind,

the court recites the relevant facts.

In the early 1990s, David Cardon and Noel Vallejo were business partners and friends.

Their first venture relevant to this dispute was a partnership named United Education Centers; it

marketed educational products for Novell, Inc. through joint advertising with authorized Novell

education centers.  The partnership agreement initially vested most of the ownership in Mr.

Vallejo.  Mr. Cardon's ownership interest grew year by year until it maxed at forty percent.

In 1993, the parties incorporated as United Education Centers, Inc. ("UEC").  They also

formed Direct List Services, Inc., which purchased mailing lists mainly from UEC, and Mount

Franklin Holding Company, L.L.C., which held the real estate associated with UEC's business.

Mr. Cardon voluntarily entered an officer's employment agreement with UEC that required him

to sell all of his shares in that company upon his resignation.

In 1998, UEC changed its name to TestOut! Corporation.  The name change did not alter

their business model or their volatile income stream.  For example, while 1998 was a very

successful year, TestOut! suffered a net loss of more than $1.4 million in 1999.  This business

environment strained Mr. Cardon's relationship with Mr. Vallejo, and there is evidence of

disagreements between the two men at the office.

---

[3]*Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1068 (10th Cir. 2005) (quoting *Lawmaster
v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997)).

[4]*Id.*

TestOut!'s losses continued during the first part of 2000.  On June 14, 2000, Mr. Cardon

voluntarily resigned from the company.  His resignation letter said:

> I hereby resign as a Director and Corporate Secretary of TestOut!
> Corporation, Direct Lists Services, Inc., and Mount Franklin Holding Company,
> L.L.C.
>           With my resignation, I give to you my voting shares in these companies
> and sell all of my stock in these companies to you pursuant to the terms of our
> buy-sell agreement.  This document is also used as written notification of
> termination of all Employment Agreements between myself and the companies
> listed above.[5]

There is some dispute as to whether there was a buy-sell agreement in place at the time

Mr. Cardon resigned.  Defendants claim that the Leaving Clause in the original UEC partnership

agreement governed the terms by which Mr. Cardon was obligated to sell his shares to the

companies.  Mr. Cardon claims that UEC's incorporation rendered the UEC partnership

agreement's Leaving Clause a nullity, and that the relevant buy-sell agreement was only in draft

form when he resigned.  Thus, the parties dispute whether a buy-sell agreement that governed the

*terms* of Mr. Cardon's sell was in place, but they agree that Mr. Cardon was in fact obligated to

sell his shares when he resigned — in other words, that his resignation triggered his duty in his

employment agreement to sell his shares, with the sell's terms specified either in UEC's

partnership agreement or in a then-unsigned agreement.

TestOut! was an S-corporation; as such, Mr. Cardon bore significant personal tax liability

for the company's income.  The company's practice was to make distributions to Cardon to cover

his personal tax liability.  As noted, 1998 was a good year for TestOut!, resulting in a large

---

[5]Mem. in Supp. of Defs.' Mot. for Summ. J., Ex. 14.

personal tax bill for Mr. Cardon.  Unfortunately, TestOut! filed its 1998 taxes late — after he had

resigned.  He therefore was unable to collect reimbursement from TestOut! for his personal

taxes.  Mr. Cardon made that representation to the Internal Revenue Service and the Utah State

Tax Commission when negotiating a resolution to tax troubles that stemmed from TestOut!'s

1998 success.  For example, in a letter to the IRS dated April 10, 2001, Mr. Cardon wrote:

> TestOut! Corporation did not file its 1998 taxes until August, 2000. This late
> filing brought an enormous financial burden to my wife and I because *I had
> already resigned my shares* and position at TestOut! Corporation (I resigned in
> June, 2000) and I therefore have no money from Testout to pay this 1998 tax.[6]

And in an undated letter to the Utah State Tax Commission he wrote: "In 1998, I was a 40%

owner of TestOut! Corporation. . . . However, by the time that TestOut! accountants finally

completed the 1998 tax information in August, 2000, *I had already resigned my* position and

*shares of the company*.  My resignation date was June 14, 2000."[7]  Based in part on these

representations, the IRS accepted Mr. Cardon's compromise offer and the Utah State Tax

Commission waived penalties, saving the Cardons tens of thousands of dollars that might

otherwise have been due for taxes.

     After Mr. Cardon resigned in June 2000 and gave up his shares, he negotiated with Mr.

Vallejo for the next several months over how much the shares were worth.  In July 2001, Mr.

Cardon requested information from defendants regarding the companies' financial performance

so he could value his shares.  Specifically, he requested information relating to the time after his

---

[6]Defs.' Mem. in Supp. of Mot. for Summ. J., Ex. 5, at 2 (emphasis added).

[7]*Id.* Ex. 20, at 1 (emphasis added).

resignation in June 2000.  Mr. Vallejo refused to disclose this information to him; Mr. Vallejo

believed that since Mr. Cardon resigned and sold his shares in June 2000, he was not entitled to

the companies' financial information after that date.  Mr. Cardon then contacted a lawyer and

considered arbitration to obtain this information.

Ultimately, however, Mr. Cardon decided not to pursue that information.  Instead, he

spent the rest of July 2001 negotiating a sell price and final settlement between himself and the

companies.  Numerous offers and counteroffers culminated in a final agreement made on August

2, 2001, that paid Mr. Cardon $94,484.87 for his stock shares and for his personal taxes.  In this

agreement, Mr. Cardon also released all claims against the companies, its employees, and Mr.

Vallejo.  The agreement also contained an attorney's fee provision in the event of its breach.  Mr.

Cardon voluntarily entered this agreement despite his knowledge that the defendants never

provided information relating to the companies' finances following his June 2000 resignation

Nearly three years after he signed this agreement, Mr. Cardon filed this suit against the

three companies, Mr. Vallejo, and Mr. Douglas Edwards (one of the companies' employees).  He

claims he learned in 2003 that the companies' financial performance greatly improved in 2001

and that, based on this improvement, his shares in August 2001 would have been worth

approximately $5 million.  He claims that defendants knew this information when they

negotiated the August 2, 2001, agreement, and that they intentionally failed to disclose it to him.

These actions, he claims, violate the federal securities fraud statutes and the Utah securities fraud

statutes.  He seeks redress under Rule 10b-5 and various other common law causes of action.

## II.    Cardon's Rule 10b-5 Claim Fails for Lack of Transaction Causation.

To prevail on his Rule 10b-5 federal securities fraud claim, Mr. Cardon must prove these

five elements:

> (1) the defendant made an untrue or misleading statement of material fact, or
> failed to state a material fact necessary to make statements not misleading; (2) the
> statement complained of was made in connection with the purchase or sale of
> securities; (3) the defendant acted with scienter, that is, with intent to defraud or
> recklessness; (4) *the plaintiff relied on the misleading statements*; and (5) the
> plaintiff suffered damages as a result of his reliance.[8]

The Supreme Court has explained that the fourth element, reliance, "provides the requisite causal

connection between a defendant's misrepresentation and a plaintiff's injury."[9]  That causal

connection consists of two subparts — transaction causation and loss causation — and "[i]t is

long settled that a securities-fraud plaintiff 'must prove both'" of them.[10]  "Transaction causation

means that 'the violations in question *caused the [plaintiff] to engage in the transaction in*

*question*.'"[11]  In contrast, "[l]oss causation 'is the causal link between the alleged misconduct and

the economic harm ultimately suffered by the plaintiff.'"[12]

---

[8]*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003) (emphasis added).

[9]*Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988).

[10]*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)) (emphasis added).

[11]*AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000) (quoting *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380–81 (2d Cir. 1974)).

[12]*Lentell*, 396 F.3d at 172 (quoting *Emergent Capital Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).

Defendants argue that Mr. Cardon cannot prove transaction causation.  The court agrees. The securities fraud violations Mr. Cardon alleges occurred in 2001, well after he voluntarily resigned on June 14, 2000.  Mr. Cardon's employment agreement required him to sell all of his stock in the corporations upon his resignation.  He admitted this several times in his deposition. For instance, Mr. Cardon testified:

> A.   [I]t's in our shareholder agreement that — and my employment agreement — that when I leave I'm required to sell my ownership shares.
> Q.   So you understood that under your employment agreement at the time you left, at the time you resigned on June 14, 2000, you were required to sell your shares.  You understood that, correct?
> A.   Yes, I did.
>      . . . .
> Q.   And when did you reach an agreement that you would sell your shares?
> A.   I was required by the shareholder agreement and my employment agreement to sell my shares when I resigned.
>      . . . .
> A.   I said it the best I could, Bruce, which is well understood that I was going to comply with my employment agreement.  Upon my resignation I would sell my shares.[13]

Mr. Cardon also represented to several entities, including the Internal Revenue Service, the Utah State Tax Commission, and First Security Bank, that his resignation triggered his obligation to sell his shares — and that he thought he had sold them as of the date he resigned. For example, in a letter to the IRS dated April 10, 2001, Mr. Cardon wrote:

> TestOut! Corporation did not file its 1998 taxes until August, 2000. This late filing brought an enormous financial burden to my wife and I because *I had already resigned my shares* and position at TestOut! Corporation (I resigned in June, 2000) and I therefore have no money from Testout to pay this 1998 tax.[14]

---

[13]David Cardon Dep. 41:22–44:2, Aug. 2, 2005.

[14]Defs.' Mem. in Supp. of Mot. for Summ. J., Ex. 5, at 2 (emphasis added).

In an undated letter to the Utah State Tax Commission he wrote: "In 1998, I was a 40% owner of TestOut! Corporation. . . . However, by the time that TestOut! accountants finally completed the 1998 tax information in August, 2000, *I had already resigned my* position and *shares of the company*.  My resignation date was June 14, 2000."[15]  And when First Security Bank asked Mr. Cardon to sign an agreement that modified a TestOut! loan he had personally guaranteed, he wrote a letter explaining that "On June 14, 2000, I resigned my position at TestOut! Corporation and sold my 40% ownership to Noel Vallejo for $0.00."[16]  Though he deleted this language in a subsequent draft, he explained the language of this first draft in his deposition:

> A.    At the time I wrote this letter, it was January 9th, 2001. I did not, I genuinely did not think I was an owner of the companies.
>        . . . .
> Q.    And this goes beyond that, though.  This letter says on June 14th, "I resigned and sold my ownership to Noel, my 40 percent ownership to Noel."  So at the time you wrote this, you also believed that you sold your 40 percent ownership to Noel on June 14, 2000, correct?
> A.    I understood that I was not an owner of the company at that time.
>        . . . .
> Q.    At the time you wrote this letter, you believed you had sold your ownership interests, your 40 percent ownership interests, to Vallejo on June 14th, 2000[?]
>        . . . .
> A.    Yes.[17]

Based on Mr. Cardon's repeated, unambiguous admissions, the triggering event that "caused [him] to engage in the transaction" of selling his shares was his voluntary resignation in June 2000, not any alleged misrepresentation by Mr. Vallejo or Mr. Edwards in 2001.  As a

---

[15] *Id.* Ex. 20, at 1 (emphasis added).

[16] *Id.* Ex. 21, at 1.

[17] Cardon Dep. 106:22–109:1.

result, Mr. Cardon cannot prove transaction causation.  The defendants are therefore entitled to summary judgment on Mr. Cardon's Rule 10b-5 claims.

### III.    Mr. Cardon Cannot Prove Reasonable or Justifiable Reliance.

The defendants argue that they are entitled to summary judgment on Mr. Cardon's federal securities fraud, negligent misrepresentation, and common law fraud claims because he cannot show justifiable reliance, which is an element of each of these claims.[18]  The court agrees. Cardon's failure to prove reliance is a separate reason for granting summary judgment in defendants' favor on Cardon's Rule 10b-5 claim.  It also entitles defendants to summary judgment on Cardon's fraud and negligent misrepresentation claims.

The Utah courts have explained the reliance element of fraud as follows:

> Generally, a plaintiff may justifiably rely on positive assertions of fact without independent investigation.  It is only where, under the circumstances, the facts should make it apparent to one of his knowledge and intelligence, or he has discovered something which should serve as a warning that he is being deceived, that a plaintiff is required to make his own investigation.[19]

Whether reliance is reasonable "must be considered with reference to the facts of each case"[20] and "'is usually a matter within the province of the jury.'"[21]  "'[T]here are,'" however,

---

[18]*See Grubb v. Federal Deposit Ins. Corp.*, 868 F.2d 1151, 1162 (10th Cir. 1989) (federal securities fraud); *Atkinson v. IHC Hospitals, Inc.*, 798 P.2d 733, 737 (Utah 1990) (negligent misrepresentation); *Masters v. Worsley*, 777 P.2d 499, 501–02 (Utah Ct. App. 1989) (fraud).

[19]*Conder v. A.L. Williams & Assoc., Inc.*, 739 P.2d 634, 638 (Utah Ct. App. 1987) (citations omitted).

[20]*Id.*

[21]*Armed Forces Ins. Exchange v. Harrison*, 70 P.3d 35, 45 (Utah 2003) (quoting *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1067 (Utah 1996)).

"'instances where courts may conclude that, as a matter of law, there was no reasonable reliance,'"[22] such as where "a party learns that the representation is not accurate."[23]  In such circumstances, "continued reliance on that representation is unreasonable."[24]

Based on the facts of this case, the court holds that this is one instance where, "'as a matter of law, there was no reasonable reliance.'"[25]  Mr. Cardon is an intelligent and well-educated businessman.  In 2001, he held a bachelor's degree and master's of business administration degree from Brigham Young University.  He had been involved with the company's management for several years.  He also knew that defendants had chosen not to deliver to him information he had requested about the company's financials that he hoped to use to value his shares.  Yet despite his training and his knowledge that he lacked full information about the companies' financial performance, Cardon continued to negotiate with Vallejo.  The defendants' refusal to turn over the information should have made "it apparent to one of [Mr. Cardon's] knowledge and intelligence" that he made assumptions about the companies' finances at his own peril.  His failure to complete any further investigation on his own is fatal to any claim of "reasonable reliance" as fraud and negligent misrepresentation require.

Mr. Cardon argues that, as to his Rule 10b-5 claim, he does not need to prove reliance because in a Rule 10b-5 case based on a failure to disclose, "reliance on the omission is

---

[22]*Id.* (quoting *Gold Standard*, 915 P.2d at 1067).

[23]*Id.*

[24]*Id.*

[25]*Id.* (quoting *Gold Standard*, 915 P.2d at 1067).

presumed when the plaintiff establishes that the defendant withheld material information and that the defendant owed the plaintiff a duty to disclose."[26]  He claims this rule applies because defendants owed him a duty to disclose the companies' financial information, even relating to the time after he resigned in June 2000.  Assuming without deciding that the defendants in fact owed Mr. Cardon a duty to disclose, the presumed-reliance rule has no application here.  The Tenth Circuit has said that "[t]his presumption" of reliance in a failure to disclose case "recognizes the unique difficulty of proving reliance on a failure to disclose material information *of which the plaintiff did not know*."[27]  But here, Mr. Cardon obviously did in fact know that the defendants were withholding allegedly material information from him in 2001.  In the face of these undisputed facts, a presumption cannot legitimately operate.  Because Mr. Cardon knew defendants were withholding information relating to the companies' finances, the presumption of reliance from *Grubb* does not apply.  Defendants are therefore entitled to summary judgment on Mr. Cardon's Rule 10b-5 claim.

   **IV.   The "Materiality" of Defendants' Alleged Misrepresentations and Omissions.**

   The defendants next argue that Mr. Cardon's securities fraud, common law fraud, and negligent misrepresentation claims should fail because the alleged misrepresentations or omissions were not material.  The court agrees that Mr. Cardon's Rule 10b-5 claim and his Utah securities fraud claim fails for this reason but holds that his common law fraud and negligent misrepresentation claims do not fail for lack of "materiality."

---

   [26]*Grubb*, 868 F.2d at 1163.

   [27]*Id.* (emphasis added).

As noted above, a Rule 10b-5 plaintiff must prove that defendants misrepresented a material fact.[28]  "Under Rule 10b-5, a misrepresentation or omission is material if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the "total mix" of information made available.'"[29]  The Seventh Circuit has held while discussing Rule 10b-5 that "[t]he materiality of the information misstated or withheld is determined in light of what the defendants knew *at the time the plaintiff committed himself to sell the stock*."[30]  The Second Circuit interpreted the Seventh Circuit's holding as applying "for purposes of § 10(b) and Rule 10b-5."[31]  The Sixth Circuit also adopted this interpretation in an unpublished opinion.[32]

The Seventh Circuit's analysis is persuasive and provides a third reason (in addition to Mr. Cardon's failure to prove transaction causation or reasonable reliance) why defendants are entitled to summary judgment on Mr. Cardon's Rule 10b-5 claim: he cannot show a material misrepresentation as of his resignation on June 14, 2000, the point at which he admitted he was obligated to sell his shares.

Additionally, Utah courts have adopted a state law analogue to the Seventh Circuit's rule in the context of Utah's securities statutes.  Utah Code Ann. § 61-1-1(2) makes it "unlawful for

---

[28]*See Adams*, 340 F.3d at 1095.

[29]*Basic*, 485 U.S. at 231–32 (citation omitted).

[30]*Michaels v. Michaels*, 767 F.2d 1185, 1195 (7th Cir. 1985).

[31]*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 181 (2d. Cir. 2001).

[32]*See Greening v. Litton Indus. Automation Sys., Inc.*, No. 93-2351, 1995 WL 94743, at *2 (6th Cir. Mar. 6, 1995).

any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to: . . . [m]ake any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."[33]  The Utah Supreme Court has held that a material fact is "something which a buyer or seller of ordinary intelligence and prudence would think to be of some importance *in determining whether to buy or sell*."[34]  This rule — Utah's equivalent to the Seventh Circuit's — leads to the same result: summary judgment is proper because Mr. Cardon had already determined to sell his shares when the alleged misrepresentations occurred in 2001. He does not allege that when he resigned on June 14, 2000 (thereby triggering his obligation to sell), he did so based on a material misrepresentation or omission.  The defendants are therefore entitled to summary judgment on Mr. Cardon's Utah securities fraud claim.

Nothing, however, in the Seventh Circuit's rule or Utah's rule indicates that they apply outside of the securities statutes context.  The defendants themselves have cited authorities that recognize that Rule 10b-5 (and rules of law stemming from it) prohibits only certain kinds of fraud.  For instance, another judge in this district previously said that stock sellers' "dissatisfaction with the price offered by" their buyer "may fall within the other claims presented, but does not constitute a violation of Rule 10b-5."[35]  Accordingly, the Seventh Circuit's rule (and the Utah analogue) of determining "materiality" apply only to causes of action based on

---

[33]Utah Code Ann. § 61-1-1(2).

[34]*S & F Supply Co. v. Hunter*, 527 P.2d 217, 221 (Utah 1974) (emphasis added).

[35]*Alta Health Strategies, Inc. v. Kennedy*, 790 F. Supp. 1085, 1091 n.9 (D. Utah 1992).

securities regulation statutes, and not to common law fraud or negligent misrepresentation claims.  Defendants therefore are not entitled to summary judgment on Cardon's fraud or negligent misrepresentation claims based on "materiality."

### V.   Mr. Cardon's Knowledge that Defendants Withheld Information Does Not Preclude His Utah Securities Claims.

As discussed above, Mr. Cardon's Utah securities fraud claim fails because the alleged omissions were not material to his decision to sell — the alleged frauds occurred one year after he resigned and triggered his obligation to sell his shares.  The defendants also argue that summary judgment is appropriate on Mr. Cardon's Utah securities claim because Mr. Cardon knew while negotiating with Mr. Vallejo in 2001 that Mr. Vallejo was withholding information from him.  This argument is based on Section 61-1-22(3) of the Utah Code, which states that a securities *seller* who makes a material misrepresentation or omission "is not liable" for securities fraud if the *buyer* "knew of the untruth or omission."[36]  The defendants — buyers of Mr. Cardon's shares — argue that the inverse should also be true: that the statute, construed as a whole, also precludes actions by sellers against buyers if the *seller* (here Mr. Cardon) knew a *buyer* (defendants) made false statements or omissions in connection with the transaction.

While this position has some logical appeal, basic canons of statutory construction preclude the court from adopting it.  Utah courts "first look to the plain language of a statute to determine its meaning."[37]  Nothing in the plain language of § 61-1-22(3) suggests that it was

---

[36]Utah Code Ann. § 61-1-22(3).

[37]*J. Pochynok Co., Inc. v. Smedsrud*, 116 P.3d 353, 357 (Utah 2005).

intended to shield *buyers* from liability.  "Furthermore, 'courts are not to infer substantive terms into the text that are not already there.  Rather, the interpretation must be based on the language used, and the court has no power to rewrite the statute to conform to an intention not expressed.'"[38]  Accepting defendants' arguments would require the court to infer the substantive term "buyer" into the statute where it does not already exist and rewrite § 61-1-22(3) to conform to an intention that the Utah legislature did not express.  This theory therefore does not warrant summary judgment for defendants on Mr. Cardon's Utah securities claim.

## VI.    Mr. Cardon's Control Person Liability Claims Fail.

Mr. Cardon seeks to hold Mr. Vallejo liable under 15 U.S.C. § 78t(a) for control person liability.  "'[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) "control" over the primary violator by the alleged controlling person.'"[39]  The court has held that Mr. Cardon cannot establish a primary violation of federal securities laws.  As such, he cannot old Mr. Vallejo liable for control person liability.  Mr. Vallejo is therefore entitled to summary judgment on this claim.

## VII.    Mr. Cardon's Quantum Meruit Claims Fail.

Mr. Cardon's amended complaint asserts causes of action in quantum meruit "[i]n the event Defendants deny the existence or enforceability of the Agreement under which Cardon sold

---

[38]*C.T. ex rel. Taylor v. Johnson*, 977 P.2d 479, 481 (Utah 1999) (quoting *Berrett v. Purser & Edwards*, 876 P.2d 367, 370 (Utah 1994)).

[39]*City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1270 (10th Cir. 2001) (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998)).

his ownership interests in the Companies dated August 2, 2001."[40]  The defendants claim that

they "have never denied the existence or enforceability of the August 2nd Agreement."[41]  Since

the defendants are bound by that admission, the court holds that Mr. Cardon's quantum meruit

claims fail as a matter of law, for "'[r]ecovery under *quantum meruit* presupposes that no

enforceable written or oral contract exists.'"[42]  Defendants are therefore entitled to summary

judgment on Mr. Cardon's eighth and ninth causes of action.

### VIII.  Attorney's Fees

Finally, the defendants ask the court to award attorney's fees.  Their request is based on

Section 78-27-56.5 of the Utah Code, which states, "A court may award costs and attorney's fees

to either party that prevails in a civil action based upon any . . . written contract . . . when the

provisions of the . . . written contract . . . allow at least one party to recover attorney's fees."[43]

The written contract between Mr. Cardon and Mr. Vallejo dated August 2, 2001, expressly

provides that "[i]n the event any party defaults under the terms of this agreement, the defaulting

party shall pay all costs incurred by the other party in enforcing the terms hereof including

reasonable attorneys' fees."[44]

---

[40]Second Am. Compl. ¶¶ 95, 101.

[41]Defs.' Mem. in Supp. of Mot. for Summ. J. (Docket No. 93), at 46.

[42]*Karapanos v. Boardwalk Fries, Inc.*, 837 P.2d 576, 578 (Utah Ct. App. 1992) (quoting *Davies v. Olson*, 746 P.2d 264, 268 (Utah Ct. App. 1987)).

[43]Utah Code Ann.§ 78-27-56.5.

[44]Ex. 34 to Defs.' Mem. in Supp. of Mot. for Summ. J., ¶ 6.

The court finds that by bringing this suit, Mr. Cardon is in default of the release of claims provision in the August 2nd agreement.[45]   Based on the court's rulings, the defendants are prevailing parties under Utah Code Ann. § 78-27-56.5 and are entitled to an award of reasonable attorney's fees.   The court orders the defendants' attorneys to submit an affidavit of fees to the court within twenty (20) days of the date of this order together with a proposed order awarding fees.   The fees to be awarded are, as provided in the contract, strictly limited to those necessary to enforce the contract.

### IX.      Conclusion and Remaining Claims

The court hereby GRANTS defendants' motion for summary judgment and for attorney's fees (# 92).   The defendants are entitled to summary judgment on Mr. Cardon's first, second, third, fourth, sixth, eighth, and ninth causes of action.   Cardon's Rule 10b-5 claim fails for three separate, independent reasons: he cannot establish transaction causation, reasonable reliance, or materiality.   His control person liability claim fails because his Rule 10b-5 claim fails.   Cardon's Utah securities fraud claim fails because the alleged misrepresentations were not material to his decision to resign, which triggered his obligation to sell.   And his fraud and negligent misrepresentation claims fail because he completed negotiations with Mr. Vallejo though he knew that he lacked full financial, thereby eliminating any claim of reasonable reliance.

The defendants did not seek dismissal of Mr. Cardon's fifth or seventh causes of action — breach of fiduciary duty or conversion — in their summary judgment motion.   These claims are thus still pending.   And defendant Squire & Company, P.C. failed to file a summary judgment

---

[45]*See id.* ¶ 3.

motion; Mr. Cardon's tenth and eleventh causes of action for breach of fiduciary duty and professional negligence against Squire & Company likewise remain intact.

Since the court has resolved all the federal claims, and since state law predominates over the remaining claims, the court declines to exercise supplemental jurisdiction over Cardon's fifth, seventh, tenth, and eleventh causes of action.  These claims present some state law questions that are best resolved in state court.  The court therefore orders under 28 U.S.C. § 1367(c) that these claims be DISMISSED WITHOUT PREJUDICE.  The clerk's office is directed to close the case.

SO ORDERED.

DATED this 22nd day of March, 2006.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge